THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

OLEKSANDR WASHINGTON,                    :
*Administrator of the Estate of Max Burakho*   :
                                         :
          Plaintiff,                     :   3:23-CV-01632
                                         :   (JUDGE MARIANI)
          v.                             :
                                         :
TROOPER SETH BROWN, *et al.*,            :
                                         :
          Defendants.                    :

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Pennsylvania State Police's Rule 12(b)(6) Motion to Dismiss (Doc. 6) is

pending before the Court. With its Motion, Defendant asks the Court to dismiss Count II and

Count III of Plaintiff's Complaint. (Doc. 11 at 5.)

The Plaintiff in the Complaint is Oleksandr Washington, father and Administrator of

the Estate of Max Burakho. (Compl., Doc. 1, ¶ 4.) The Defendants are Seth Brown and

Justin Kressler, who were troopers with the Pennsylvania State Police, as well as the

Commonwealth of Pennsylvania/Pennsylvania State Police ("PSP"). (*Id.* ¶¶ 6-8.)  Plaintiff's

Complaint (Doc. 1) filed on October 2, 2023, alleges that Defendants shot Plaintiff's son in

the back during a mental health check requested by Plaintiff. Plaintiff's Complaint contains

three counts: Count I asserts a claim of excessive force against Brown and Kressler (Doc. 1

¶¶ 49-55); Count II asserts an American with Disabilities Act, 42 U.S.C. § 12101, *et seq*.,

claim against the PSP (Doc. 1 ¶¶ 56-85); and Count III asserts a claim against the PSP

under the Rehabilitation Act, 29 U.S.C. § 794, *et seq*. (Doc. 1 ¶¶ 86-89). For the reasons

explained below, the Court will deny Defendant's Motion to Dismiss (Doc. 6).

## II. BACKGROUND[1]

Plaintiff is Oleksandr Washington ("Mr. Washington") as the Administrator of the

estate of his late son, Max Burakho, acting pursuant to Letters of Administration issued to

him by the Monroe County Register of Wills on July 31, 2023. (Doc. 1 ¶ 4.) At the time of his

death on September 8, 2022, Burakho was an adult individual domiciled in Monroe County,

Pennsylvania. (*Id*. ¶ 5.) Defendant Seth Brown ("Trooper Brown") was at all times relevant

hereto employed by the PSP as a Trooper. (*Id*. ¶ 6.) Defendant Justin Kressler ("Trooper

Kressler") was at all times relevant hereto employed by the PSP as a Trooper. (*Id*. ¶ 7.)

Defendant Commonwealth of Pennsylvania/PSP is a state and department of a state. (*Id*. ¶

8.)

Burakho, born August 17, 1986, was diagnosed during his adult years with multiple

mental health disorders, including schizophrenia, depressive disorder, and panic disorder.

(Doc. 1 ¶ 9.) In addition to his mental health diagnoses, Burakho also suffered from Wilson's

disease, a rare disorder that causes copper to accumulate in the liver, brain and other vital

organs. (*Id*. ¶ 10.) On June 1, 2017, an Administrative Law Judge issued a fully favorable

---

[1] Unless otherwise noted, the background information reiterates facts contained in Plaintiff's
Complaint (Doc. 1).

decision on behalf of Burakho finding that he was disabled within the meaning of the Social Security Act as of April 27, 2014. (*Id*. ¶ 11.)

Trooper Brown and PSP knew of Burakho's Mental Health Disorders. Burakho's mental health disorders were well known to many PSP officials, including Trooper Brown, well before the events at issue on September 8, 2022. (*Id*. ¶ 12.) In fact, Trooper Brown was dispatched to Burakho's residence on September 12, 2020, in response to a report that Mr. Burakho wanted to harm himself or others. (*Id*. ¶ 13.) Trooper Brown knocked on the door, and after several minutes, Burakho opened the front door with a long rifle across his chest while wearing a gas mask, mechanics gloves, and a military style hat. (Doc. 1 ¶ 14.) Trooper Brown pulled his pistol on Burakho, and as Trooper Brown backed away from the door, Burakho closed the door and went back inside. (*Id*. ¶ 15.) Burakho was convinced by PSP officials to exit the residence unarmed and he was taken into custody and transported to a local hospital where a 302 mental health warrant was filled out and completed for Burakho. (*Id*. ¶ 16.) Trooper Brown assisted with obtaining the 302 warrant for Burakho. (*Id*.)

PSP responded to Burakho's residence in Monroe County on multiple other occasions prior to September 8, 2022, including on at least February 13, 2021, May 31, 2021, and April 3, 2022. (*Id*. ¶ 17.) On February 13, 2021, PSP responded to a call that Burakho was walking through neighborhood streets in a military outfit and holding a rifle. (*Id*.

3

¶ 18.) Burakho was detained without incident and agreed to be transported to a local hospital for evaluation. (*Id*.)

On May 31, 2021, PSP responded to a phone call from an anonymous caller about a "male at gunpoint" in Burakho's neighborhood. (Doc. 1 ¶ 19.) PSP arrived at Burakho's residence and observed Burakho exit the front door and run down the street wearing a red British military outfit. (*Id*. ¶ 20.) After being tased, Burakho was taken into custody without further incident. (*Id*. ¶ 21.) At that time, Burakho stated to PSP troopers that he was walking around his neighborhood with a flintlock prior to PSP arrival because he was in Scotland fighting for his country. (*Id*. ¶ 22.)

On April 3, 2022, PSP troopers were dispatched for a welfare check on Burakho relating to a text message saying "goodbye" to his father. (*Id*. ¶ 23.) After PSP arrived, efforts to get Burakho to open the door and exit the residence were initially unsuccessful. (Doc. 1 ¶ 24.) Eventually, though, Burakho opened the front door and informed the PSP troopers that he was fine, was not a threat of harm to himself, and did not want to go to the hospital, so PSP left without incident. (*Id*. ¶ 25.) Burakho never attempted to harm anyone, including law enforcement officers, during any of these encounters with PSP. (*Id*. ¶ 26.)

On September 8, 2022, shortly before 10:00 a.m., Washington called emergency responders to conduct a welfare check of Burakho at Burakho' s home on Deer Drive North in Middle Smithfield Township in Monroe County. (*Id*. ¶ 27.)  During that 911 call, Washington reported that Burakho had sent an alarming image by text of a rifle pointed at a

4

gas canister. (*Id*. ¶ 28.) Washington specifically asked if troopers from PSP Stroudsburg could check on Burakho's welfare. (*Id*. ¶ 29.)

Six PSP officers (in four vehicles) were the first to arrive at Mr. Burakho's residence. (Doc. 1 ¶ 30.) The responding officers included Troopers Brown and Kressler as well as Corporal Lee Dudick and Troopers Dylan Chapman, Michael Besten, and Zachary Mascelli. (*Id*. ¶ 31.) Prior to their arrival at Burakho's residence, all responding officers, including Corporal Dudick and Troopers Brown, Kressler, Chapman, Besten, and Mascelli, knew of Burakho's previous welfare checks, involuntary mental health commitments (302s), and incidents involving firearms because of a query of department records using Burakho's address and/or their prior personal involvement responding to calls to Burakho's home. (*Id*. ¶ 32.)

With respect specifically to Trooper Kressler, he reviewed information that had been entered into the MDT for Burakho prior to arriving at his residence on September 8, 2022, so Trooper Kressler was aware of a number of cautions and remarks regarding Burakho, including cautions that Burakho was mentally unstable, had a prior mental health commitment, and he owned rifles. (*Id*. ¶ 33.)

When they arrived at Burakho's home, the responding officers put on heavy vests and got out their rifles. (*Id*. ¶ 34.) Facing the house, Troopers Kressler and Mascelli moved toward the right of the residence, Trooper Brown positioned to the left of the residence, and Corporal Dudick and Troopers Chapman and Besten positioned themselves in the front of

the house. (Doc. 1 ¶ 35.) Efforts to contact Burakho on his cell phone were unsuccessful as the phone was either not turned on or was dead. (*Id*. ¶ 36.) Efforts to hail Burakho over the PA system were also unsuccessful as Burakho did not respond and remained in the house. (*Id*. ¶ 37.)

After the responding officers were at the residence for approximately thirty minutes without contact with Burakho, Burakho attempted to flea out the back door of the home holding a long gun. (*Id*. ¶ 38.) Trooper Brown immediately discharged his AR-15 at Burakho. (*Id*. ¶ 39.) Trooper Brown's first shot missed Burakho. (*Id*. ¶ 40.) Trooper Brown's second shot missed Burakho. (Doc. 1 ¶ 41.) With his third shot, Trooper Brown aimed at the center of Burakho's back and pulled the trigger of his AR-15. (*Id*. ¶ 42.) Burakho was shot in the left center of the back causing him to fall and drop his long gun. (*Id*. ¶ 43.) At that point, Trooper Brown retreated and took cover behind a parked automobile in Burakho's driveway. (*Id*. ¶ 44.) Burakho was unable to stand after being shot by Trooper Brown, and he remained largely immobilized on the back patio of his residence. (Doc. 1 ¶ 45.) After a few minutes passed, Burakho, while still on the ground, was shot in the right shoulder by Trooper Kressler with his personally owned AR-15. (*Id*. ¶ 46.)

Law enforcement officials subsequently approached Burakho and found him non-responsive. (*Id*. ¶ 47.) Burakho was dead at the age of thirty-six. (*Id*. ¶ 48.)

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S.

7

at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same

presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it

does require a pleading to show 'more than a sheer possibility that a defendant has acted

unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal

citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal,* 556 U.S. at

678). "The plausibility determination is 'a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting

*Iqbal,* 556 U.S. 679).

The Third Circuit Court of Appeals has identified the following three-step inquiry as

appropriate to determine the sufficiency of a complaint pursuant to *Twombly* and *Iqbal:*

> First, the court must take note of the elements a plaintiff must plead to state a
> claim. Second, the court should identify allegations that, because they are no
> more than conclusions, are not entitled to the assumption of truth. Finally,
> where there are well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an entitlement
> for relief.

*Burch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 (3d Cir.2011); *see also Connelly v. Steel*

*Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013); *Santiago v. Warminster Twp.,* 629 F.3d

121, 130 (3d Cir. 2010).

In considering a motion to dismiss, the reviewing court examines:

> the "complaint, exhibits attached to the complaint, [and] matters of public
> record," *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), we can also

8

consider documents "that a defendant attaches as an exhibit to a motion to dismiss," *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), if they are "undisputedly authentic" and "the [plaintiff's] claims are based [on them]," *Mayer*, 605 F.3d at 230. That holding extends to settlement material because plaintiffs "need not provide admissible proof at th[e] [motion-to-dismiss] stage." *In re OSG Sec. Litig.*, 12 F. Supp.3d 619, 622 (S.D.N.Y. 2014); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp.3d 936, 961 n.5 (N.D. Cal. 2014) (same). Moreover, the Supreme Court has been clear about the scope of our review, stating we "*must* consider the complaint in its entirety, as well as other sources [we] ordinarily examine when ruling on ... motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis added).

*Estate of Roman v. City of Newark,* 914 F.3d 789, 796–97 (3d Cir.), *cert. denied sub nom. Estate of Roman v. City of Newark, New Jersey,* 140 S. Ct. 82, 205 L. Ed. 2d 28 (2019), and *cert. denied,* 140 S. Ct. 97, 205 L. Ed. 2d 28 (2019).

Even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Defendant PSP contends that the Court should dismiss Counts II and III of Plaintiff's Complaint because Plaintiff fails to adequately plead ADA and Rehabilitation Act claims against the PSP.[2] Defendant claims that, even if the ADA does apply in exigent circumstances, Plaintiff nonetheless fails to plead all the elements to plausibly allege a claim under the ADA.[3] (Doc. 11 at 1-2.)

The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Thus, to state a claim under the ADA or RA, the Complaint must allege that Burakho: (1) was a "qualified individual;" (2) "with a disability;" (3) who was "excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity;" and (4) "by reason of his disability." *Bentler v. Nederostek*, No. 22-1107, 2023 WL 3510822, at *8 (M.D. Pa. May 17, 2023). The Court will address each element individually to determine whether Plaintiff has plausibly alleged such a claim.

---

[2] "Because the same standards govern both . . . RA and ADA claims, [the court] may address both claims in the same breath." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). Thus, the Court will address both Counts II and III together in this analysis.

[3] The Court will address Defendant's argument that the ADA does not apply in exigent circumstances in the "Reasonable Accommodation" section of this Opinion.

## A. Qualified Individual

Defendant first contends that Plaintiff fails to allege that Burakho was a "qualified individual" under the ADA. (Doc. 11 at 7.) Specifically, Defendant argues that because Burakho "posed a significant risk to responding police [...] he was not a qualified individual under the ADA or RA." (*Id.*)[4] Plaintiff, on the other hand, argues that "PSP's reliance on the 'significant risk test' for dismissal is misplaced." (Doc. 13 at 10.) The Court agrees with Plaintiff.

At this stage of the litigation, Plaintiff must allege facts that permit a plausible inference that Burakho was a qualified person with a disability within the meaning of the ADA. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009). The Third Circuit has generally held that arrestees can be "qualified individuals" under the ADA:

> The first question, then, is whether arrestees can be "qualified individuals" under the ADA, and the best response is that they can, for there is nothing to categorically exclude them from the statute's broad coverage.[9] *See Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998) (concluding that an arrestee could be a qualified individual under the ADA despite not having " 'volunteered' to be arrested"); *cf. Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-11, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (noting that a state prisoner could be a "qualified individual" under the ADA even when participation in a service, program, or activity of the State is not voluntary).

---

[4] Although Defendant also argues that "arrests are not properly considered a service, activity or benefit under the ADA" (Doc. 11 at 6), Defendant misconstrues the Third Circuit's analysis in *Haberle* to support its contention. In *Haberle,* the Third Circuit expressly stated that "[a]s a threshold matter, we consider whether the ADA applies when police officers make an arrest. Although the question is debatable, we think the answer is generally yes." *Haberle,* 885 F.3d at 178. Instead, the Third Circuit in *Haberle* noted that there was an open question as to whether arrestees will qualify under certain exigent circumstances. *Id.* at n. 9.

. . . .

That arrestees can qualify does not, of course, mean that they necessarily will qualify. There remains a question whether a potentially violent person with mental health problems who, while possessing a gun, barricades himself in another person's apartment is a "qualified individual" under the ADA. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). We have previously noted that a "significant risk test" has been used to determine whether an individual is qualified to receive protection under the analogous Rehabilitation Act. *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 303 (3d Cir. 2007). Whether application of that same test in the ADA context is appropriate, however, is not something that we need to address now. We reserve judgment on that issue for another day.

*Haberle v. Troxell*, 885 F.3d 170, 179, n. 9 (3d Cir. 2018).

The Supreme Court developed the significant risk test in *School Board of Nassau County v. Arline,* a case involving a teacher who alleged a violation of § 504 of the Rehabilitation Act after she was discharged because she had an active case of tuberculosis. 480 U.S. 273, 276, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). The Supreme Court held that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." *Id.* at 287 n. 16, 107 S.Ct. 1123. The Court essentially incorporated a significant risk test into the Rehabilitation Act's definition of a disabled person qualified to receive § 504's protection. The Court noted that this test effectuates § 504's "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks." *Id.* at 287, 107 S.Ct. 1123.

*New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 303 (3d Cir. 2007).

Here, both Plaintiff and the PSP do not dispute that Burakho had a disability. (*See* Doc. 11 at 6-7, Doc. 13 at 5.) Indeed, Plaintiff alleges that "Mr. Burakho, born August 17, 1986, was diagnosed during his adult years with multiple mental health disorders, including schizophrenia, depressive disorder, and panic disorder." (Doc. 1 ¶ 9.) Plaintiff also states that "[i]n addition to his mental health diagnoses, Mr. Burakho also suffered from Wilson's disease, a rare disorder that causes copper to accumulate in the liver, brain and other vital organs." (*Id.* ¶ 10.) Finally, Plaintiff alleges that "Mr. Burakho's mental health disorders were well known to many PSP officials, including Trooper Brown, well before the events at issue on September 8, 2022." (*Id.* ¶ 12.) Therefore, Plaintiff pleads plausible facts to indicate that Burakho had a disability within the meaning of the ADA.

Additionally, even if the Court were to apply the "significant risk" test in determining whether Burakho was a "qualified individual" under the ADA, as it does under the Rehabilitation Act, Burakho would still plausibly be found to be a qualified individual based on the facts alleged in the Complaint.[5] Under the significant risk test, Plaintiff pleads facts that suggest that the PSP could have implemented accommodations that would have resulted in eliminating significant risks of danger to the PSP officers on the scene.

First, Plaintiff alleges that the PSP failed to take various actions that could have reduced any significant risk to the health or safety of the officers. In his Complaint, Plaintiff

---

[5] The Court acknowledges that, although the Third Circuit has applied the "significant risk" test in the context of the Rehabilitation Act, *New Directions Treatment Servs.*, 490 F.3d at 303, it has not yet decided whether that test should be applied in the ADA context. *See Haberle*, 885 F.3d at 179 n. 9.

suggests that the PSP troopers on the scene could have employed accommodations, including "employing the passage of time to advantage, using non-threatening communication, respecting the individual's comfort zone and not unreasonably agitating or exciting the individual and instead calming the situation." (Doc. 1 ¶ 67.) Indeed, Plaintiff notes in his Complaint that PSP officers who responded at the Burakho's home had previously deescalated similar encounters with Burakho involving his possession of weapons. (*Id*. ¶¶ 12-26.) Plaintiff alleges that "[i]nstead of making these accommodations, PSP officers escalated the situation by surrounding the home with rifles drawn." (*Id*. ¶ 68.) This failure to implement additional accommodations in an attempt to de-escalate the situation at Burakho's home is supported by Plaintiff's allegation that "Troopers Brown and Kressler (and the other responding officers) did not have any training with respect to individuals with mental health conditions, regarding having peaceful encounters with mentally disabled persons, deescalating situations involving mentally unstable individuals and/or responding to calls that may require a 302 and/or involuntary commitment." (*Id*. ¶ 70.)

Even if the Court were to assume for the purpose of the ADA that Burakho was an "individual who poses a significant risk to the health or safety of others," Plaintiff alleges sufficient facts to plausibly dispute any inference that the risk "cannot be ameliorated by means of a reasonable modification." *New Directions Treatment Servs. v. City of Reading*,

14

490 F.3d 293, 303 (3d Cir. 2007) (internal citation omitted).[6] Plaintiff's Complaint pleads

sufficient facts to support a finding that Burakho was a "qualified individual" under the ADA

and Rehabilitation Act.

## B. Discrimination

Defendant also argues that Plaintiff fails to allege facts that would support a plausible

finding of deliberate indifference on the part of the PSP. (Doc. 11 at 7-10.) Defendant

contends that Plaintiff fails to allege actual knowledge on the part of the PSP, and that any

knowledge on the part of the troopers who first responded at the Burakho's home does not

impute the PSP. (*Id.*) The Court will address each argument in turn.

## 1. Actual Knowledge

To plead a claim for monetary damages under the ADA, Plaintiff must plausibly

allege that the PSP acted with deliberate indifference to the risk of an ADA violation.

*Haberle*, 885 F.3d at 181. "[T]o plead deliberate indifference, a claimant must allege (1)

knowledge that a federally protected right is substantially likely to be violated[,] and (2)

failure to act despite that knowledge." *Id.* (internal quotation marks and citation omitted).

---

[6] In contending that Burakho was not a "qualified individual" under the ADA via the "significant risk" test, Defendant states that "the Decedent's house was surrounded, when he suddenly emerged from the house running toward the police with his weapon." (Doc. 14 at 8.) The Court notes that this is simply not what is alleged in Plaintiff's Complaint. Rather, Plaintiff's Complaint suggests that Burakho was running away from police and was shot in the back by officers. (Doc. 1 ¶¶ 42.) Defendant's references to *Johnson v. City of Philadelphia*, 837 F.3d 343, 352 (3d Cir. 2016), and *Osagie v. Borough of State Coll.*, No. 4:20-CV-02024, 2023 WL 8191092, at *20 (M.D. Pa. Nov. 27, 2023), to support its argument that causation is not pled, discussed *infra*, are unpersuasive for the same reason.

Plaintiff can allege such deliberate indifference in one of two ways: "first, by alleging facts

suggesting that the existing policies caused a failure to 'adequately respond to a pattern of

past occurrences of injuries like the plaintiffs,' or, second, by alleging facts indicating that [

]he could prove 'that the risk of ... cognizable harm was so great and so obvious that the risk

and the failure ... to respond will alone support finding' deliberate indifference." *Id.* (quoting

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 136-37 (3d Cir. 2001)).

> Deliberate indifference requires *actual knowledge;* allegations that one would
> have or "should have known" will not satisfy the knowledge prong of deliberate
> indifference. *Bistrian v. Levi,* 696 F.3d 352, 367 (3d Cir.2012) (holding that,
> under the deliberate indifference standard, "[i]t is not sufficient that the official
> *should have known* of the risk" (emphasis added)). As such, we will not
> consider the allegedly defective evaluations as part of the knowledge analysis.

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 266 (3d Cir. 2013).

Here, Plaintiff attempts to allege deliberate indifference under the second condition,

*i.e.*, by showing the risk of harm was "so great and so obvious." (*See* Doc. 13 at 12.) In his

Complaint, Plaintiff alleges facts pleaded to show that the PSP failed to train its officers on

how to respond to an individual experiencing a mental health emergency despite those

officers knowledge of Burakho's mental health challenges and failed to accommodate

Burakho at the time of the shooting:[7]

---

[7] Defendant points out in its Reply Brief that the PSP's policies pertaining to incidents involving persons with mental illness and mental health emergencies are readily accessible online. (See Doc. 14 at 5 n. 1.) Although the Court acknowledges this contention by Defendant, such an argument is more appropriately considered on a summary judgment motion. *See Ethypharm*, 707 F.3d at 231 n.14 (Noting that a court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that

Mr. Burakho's mental health disorders were well known to many PSP officials, including Trooper Brown, well before the events at issue on September 8, 2022.

(Doc. 1 ¶ 12.)

Prior to their arrival at Mr. Burakho's residence, all responding officers, including Corporal Dudick and Troopers Brown, Kressler, Chapman, Besten, and Mascelli, knew of Mr. Burakho' s previous welfare checks, involuntary mental health commitments (302s), and incidents involving firearms because of a query of department records using Mr. Burakho's address and/or their prior personal encounters with Mr. Burakho.

(*Id.* ¶ 62.)

Trooper Kressler knew of Mr. [Burakho]'s mental health disorders as a result of a number of cautions and remarks regarding Mr. Burakho that were entered into the MDT, including cautions that Mr. Burakho was mentally unstable, had a prior mental health commitment, and he owned rifles.

(*Id.* ¶ 63.)

Trooper Brown also knew of Mr. Burakho's mental health condition based on his prior encounter with Mr. Burakho on September 12, 2020 when Trooper Brown 302'd Mr. Burakho and from the contents of the MTD regarding Mr. Burakho.

(*Id.* ¶ 64.)

Thus, the Commonwealth of Pennsylvania/PSP's knowledge of Mr. Burakho's mental health condition predated the use of excessive force described above.

(*Id.* ¶ 65.)[8]

_____

can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.")

[8] The Court disregards the conclusory statement characterizing the PSP's acts as "excessive force" contained within this otherwise factual allegation. See *Ethypharm,* 707 F.3d at 231 n.14.

Reasonable accommodations for individuals with mental disabilities and mental health conditions include, but are not limited to, employing the passage of time to advantage, using non-threatening communication, respecting the individual's comfort zone and not unreasonably agitating or exciting the individual and instead calming the situation.

(Doc. 1 ¶ 67.)[9]

Instead of making these accommodations, PSP officers escalated the situation by surrounding the home with rifles drawn.

(*Id.* ¶ 68.)

Despite knowing of the obvious risk that its troopers may discriminate on the basis of disability and/or fail to make reasonable accommodations when encountering individuals with mental health conditions and/or mental disabilities, the Commonwealth of Pennsylvania/PSP chose not to provide its troopers with training for interacting with individuals in these circumstances.

(*Id.* ¶ 69.)[10]

Based on information and belief, Troopers Brown and Kressler (and the other responding officers) did not have any training with respect to individuals with mental health conditions, regarding having peaceful encounters with mentally disabled persons, deescalating situations involving mentally unstable individuals and/or responding to calls that may require a 302 and/or involuntary commitment.

(*Id.* ¶ 70.)

---

[9] The Court disregards the conclusory statement characterizing various alternative acts by PSP officers as "reasonable accommodations" contained within this otherwise factual allegation. See *Ethypharm,* 707 F.3d at 231 n.14.

[10] The Court disregards the conclusory statement pertaining to the PSP's alleged discrimination or failure to accommodate on the basis of Plaintiff's disability contained within this otherwise factual allegation. See *Ethypharm,* 707 F.3d at 231 n.14.

This Court has found allegations like these to be sufficient to survive a motion to dismiss. In *Bentler v. Nederostek*, Judge Mannion of this Court determined that similar allegations were sufficient to defeat dismissal:

> Here, Bentler attempts to allege deliberate indifference under the second condition, *i.e.*, by showing the risk of harm was "so great and so obvious." (Doc. 23 at 18–23). He alleges the PSP officials at the boat launch never received "specialized training for interacting with individuals with mental health conditions," nor did they receive "any specialized training with respect to individuals with mental health conditions or deescalating situations involving mentally unstable individuals and/or suspects." (Doc. 1). The court finds these allegations sufficient at this stage to permit a plausible inference that "the risk of an ADA violation in such circumstances [was] patently obvious." *Young v. Scott Twp.*, No. 4:18-CV-00403, 2018 WL 4539007, at *4 (M.D. Pa. Sept. 21, 2018) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989) (explaining some risks of cognizable harm are so obvious to permit a finding of deliberate indifference, such as when, hypothetically, city policymakers fail to train their officers in the constitutional limitations on the use of deadly force)). Similar to the hypothetical in *Canton*, 480 U.S. at 390 n.10, the probability of the police encountering a mentally ill individual is so great that a reasonably jury could find that failure to train officers on the constitutional and statutory obligations of an officer in those situations constitutes deliberate indifference. Bentler's allegations against the County survive at this stage for similar reasons—he alleges the County failed to train dispatchers to identify and convey information regarding the caller's mental disturbance or instability. A reasonably jury could find the probability that 911 dispatchers receiving a call from someone who is mentally ill is so obvious that a failure to train dispatchers in this regard constitutes deliberate indifference to the likelihood of an ADA violation.

*Bentler v. Nederostek*, No. CV 3:22-1107, 2023 WL 3510822, at *9 (M.D. Pa. May 17, 2023).

Defendant relies heavily on *Haberle*, 885 F.3d 170, to contend that the facts alleged here are similar to those in *Haberle* and thus warrant the same outcome: dismissal. (*See*

Doc. 14 at 3-6.) Defendant fails to acknowledge that the alleged facts in *Haberle* are entirely distinct from those alleged here. In *Haberle*, Plaintiff Nicole Haberle's partner, Timothy Nixon, stole a firearm and committed suicide after a law enforcement officer declined to wait for crisis negotiators and instead knocked on the door of the residence that Nixon was in. *Haberle,* 885 F.3d at 174. On appeal, the Third Circuit affirmed the district court's determination that "[t]he failure to train police officers to refrain from doing so much as knocking on the door when they receive a call that a mentally ill individual has stolen a firearm, is contemplating suicide, and may be in the presence of others whose status is unknown is not so obvious [a deficiency] that the Borough could be said to have been deliberately indifferent to the need for that training." *Id*. at 183. Here, Plaintiff alleges facts that plausibly suggest that, rather than responding with individuals trained to handle mental health emergencies, the PSP officers surrounded the home with their weapons. (Doc. 1 ¶¶ 34, 35, 78, 79.)

This allegation of a forceful response to Burakho's mental health emergency without the assistance of available officers who were specialized in tactical and negotiation responses, if proven, is far more of an aggressive, risky, and escalatory approach than simply knocking on a door as alleged in *Haberle*. As this Court determined in *Bentler,* Plaintiff plausibly alleges that the risk of harm was so great and so obvious as to support a finding of deliberate indifference on the part of the PSP. *See Bentler*, 2023 WL 3510822 at *9 ("the probability of the police encountering a mentally ill individual is so great that a

reasonably jury could find that failure to train officers on the constitutional and statutory obligations of an officer in those situations constitutes deliberate indifference.").

Because Plaintiff alleges facts that indicate a failure to adequately respond to Burakho's mental health emergency, a failure to train PSP officers in responding to an individual experiencing a mental health emergency (Doc. 1 ¶¶ 69, 70, 71), as well as actual knowledge on the part of PSP's officers as to Burakho's mental health challenges (*id*. ¶¶ 12, 13, 14, 15, 32), Plaintiff plausibly alleges deliberate indifference on the part of the PSP.

## 2. Vicarious Liability

Defendant also argues that dismissal is warranted under the deliberate indifference element because "it is not enough that the individual troopers had past interactions with Mr. Burakho." (Doc. 11 at 9.) Plaintiff, on the other hand, contends that the PSP is vicariously liable for the alleged acts of its employees. The Court agrees with Plaintiff.

The Court acknowledges the divergence among the federal courts as to whether the ADA and Rehabilitation Act allow for a municipality to be vicariously liable for the acts of its employees. *See, e.g., Jones v. City of Detroit, Michigan*, 20 F.4th 1117 (6th Cir. 2021) (finding that there is no vicarious liability for violating the Rehabilitation Act or Title II of the ADA). Nonetheless, a sister court in this Circuit has concisely explained why this Court is inclined to follow the lead of other courts in finding that the PSP is vicariously liable for the acts of its employees:

> The Supreme Court recently declined to weigh in on the issue of whether a public "entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees" under Title II of the Americans with Disabilities Act, and our Court of Appeals has never addressed the issue. But every district court judge in our Circuit confronted with this question has determined public entities are vicariously liable for the conduct of their employees under Title II of the Americans with Disabilities Act. At least two judges have held, "Title II of the ADA ... provide[s] for vicarious liability and do[es] not permit liability for individuals." This reasoning in our Circuit is in accord with the reasoning from courts of appeals in other circuits. The Court of Appeals for the Ninth Circuit has held, "[w]hen a plaintiff brings a direct suit under ... Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious acts of its employees." The Court of Appeals for the Fifth Circuit has also held, "when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees."

*Geness v. Pennsylvania*, 503 F. Supp. 3d 318, 339–40 (W.D. Pa. 2020) (footnote citations omitted); *see also Guynup v. Lancaster Cnty.*, No. 06-4315, 2008 WL 4771852, at *1 (E.D. Pa. Oct. 29, 2008); *Zimmerman v. Berdanier*, No. 07-818, 2008 WL 11503557, at *6 n.10 (M.D. Pa. Jan. 25, 2008) ("Only public entities, rather than individuals, may be liable for violations of Title II of the ADA.")

Plaintiff has made plausible allegations of deliberate indifference and actual knowledge on the part of PSP's officers who responded to Plaintiff's request to conduct a wellness check on Burakho. (Doc. 1 ¶¶ 12, 13, 14, 15, 32, 69, 70, 71), Therefore, PSP is vicariously liable for the acts of its officers, and Plaintiff plausibly alleges deliberate indifference on the part of the PSP as an official entity.

## C. Causation

Defendant also contends that Plaintiff fails to allege that Burakho was discriminated against because of his disability. (Doc. 11 at 10.) Specifically, Defendant argues that

> [i]n this case, Plaintiff cannot satisfy but for causation because there are no allegations establishing that the Troopers acted because of Plaintiff's disability. Rather, Plaintiff's actions in fleeing the house with a rifle was the sole cause of the outcome. This is an intervening fact that prevents the Plaintiff from establishing causation.

(*Id.*)

For Plaintiff's part, he contends that "comparable case law confirms that the Complaint's factual allegations sufficiently allege that Mr. Burakho suffered intentional discrimination because of his disability." (Doc. 13 at 13.) The Court agrees with Plaintiff.

The Third Circuit has set out the relevant analysis pertaining to whether a plaintiff successfully alleges causation. In *Haberle*, the Third Circuit held that "[i]f the arrestee's 'disability played a role in the ... decisionmaking process and ... had a determinative effect on the outcome of that process[,]' *i.e.*, if the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met." 885 F.3d at 179 (internal quotations omitted).

Here, in his Complaint, Plaintiff alleges that:

> Mr. Burakho's mental health disorders were well known to many PSP officials, including Trooper Brown, well before the events at issue on September 8, 2022.

(Doc. 1 ¶ 12.)

Prior to their arrival at Mr. Burakho's residence, all responding officers, including Corporal Dudick and Troopers Brown, Kressler, Chapman, Besten, and Mascelli, knew of Mr. Burakho' s previous welfare checks, involuntary mental health commitments (302s), and incidents involving firearms because of a query of department records using Mr. Burakho's address and/or their prior personal encounters with Mr. Burakho.

(*Id.* ¶ 62.)

Trooper Kressler knew of Mr. Bender's mental health disorders as a result of a number of cautions and remarks regarding Mr. Burakho that were entered into the MDT, including cautions that Mr. Burakho was mentally unstable, had a prior mental health commitment, and he owned rifles.

(*Id.* ¶ 63.)

Trooper Brown also knew of Mr. Burakho's mental health condition based on his prior encounter with Mr. Burakho on September 12, 2020 when Trooper Brown 302'd Mr. Burakho and from the contents of the MTD regarding Mr. Burakho.

(*Id.* ¶ 64.)

Thus, the Commonwealth of Pennsylvania/PSP's knowledge of Mr. Burakho's mental health condition predated the use of excessive force described above.

(*Id.* ¶ 65.)[11]

Reasonable accommodations for individuals with mental disabilities and mental health conditions include, but are not limited to, employing the passage of time to advantage, using non-threatening communication, respecting the individual's comfort zone and not unreasonably agitating or exciting the individual and instead calming the situation.

---

[11] The Court disregards the conclusory statement characterizing the PSP's alleged acts as "excessive force" contained within this otherwise factual allegation. See *Ethypharm*, 707 F.3d at 231 n.14.

24

(Doc. 1 ¶ 67.)[12]

> Instead of making these accommodations, PSP officers escalated the situation by surrounding the home with rifles drawn.

(*Id.* ¶ 68.)

> Despite knowing of the obvious risk that its troopers may discriminate on the basis of disability and/or fail to make reasonable accommodations when encountering individuals with mental health conditions and/or mental disabilities, the Commonwealth of Pennsylvania/PSP chose not to provide its troopers with training for interacting with individuals in these circumstances.

(*Id.* ¶ 69.)[13]

> Based on information and belief, Troopers Brown and Kressler (and the other responding officers) did not have any training with respect to individuals with mental health conditions, regarding having peaceful encounters with mentally disabled persons, deescalating situations involving mentally unstable individuals and/or responding to calls that may require a 302 and/or involuntary commitment.

(*Id.* ¶ 70.)

Plaintiff relies on *Broadwater* to contend that these allegations of a failure to train despite knowledge of Burakho's disability are sufficient to plausibly allege causation on the part of the PSP. *See Broadwater v. Fow*, 945 F. Supp. 2d 574, 591 (M.D. Pa. 2013). While the Court acknowledges that the *Broadwater* decision relied in part on that plaintiff's

---

[12] The Court disregards the conclusory statement characterizing various alternative acts by PSP officers as "reasonable accommodations" contained within this otherwise factual allegation. See *Ethypharm,* 707 F.3d at 231 n.14.

[13] The Court disregards the conclusory statement pertaining to the PSP's alleged discrimination or failure to accommodate on the basis of Plaintiff's disability contained within this otherwise factual allegation. See *Ethypharm,* 707 F.3d at 231 n.14.

allegations that the PSP "failed to properly train troopers to have peaceful encounters with mentally and physically disabled persons and failed to establish a proper policy for handling such encounters" and that "the troopers who interacted with Broadwater were purportedly well aware of his disabilities and were attempting to escort him to a hospital for a mental health evaluation," 945 F. Supp. 2d at 591, Plaintiff omits a key portion of the Court's analysis in that case. In *Broadwater*, this Court also considered that plaintiff's allegations "that the Commonwealth and the PSP created a culture where [Fow] felt comfortable openly referring to Mr. Broadwater as a retard and as Mr. Crazy in official PSP communications...." *Broadwater,* 945 F. Supp. 2d at 591 (internal quotations omitted). Here, no similar allegations of prejudicial and invidious remarks exist.

Instead, Plaintiff's reliance on *Snider* is more persuasive. *See Snider v. Motter*, No. 4:13-CV-01226, 2016 WL 4154927, at *8 (M.D. Pa. June 2, 2016), *report and recommendation adopted,* No. 4:13-CV-1226, 2016 WL 4140728 (M.D. Pa. Aug. 4, 2016). In *Snider*, this Court addressed instances where, although there are no facts supporting a finding that a defendant treated an individual *differently* because of their disability, causation may nonetheless be plausibly alleged if there are factual allegations that the defendant did not account for the plaintiff's disability:

> Snider concedes that he was not treated differently from the other inmates. Rather, he argues that by simply treating him the same as other inmates without disabilities and failing to consider his disability with respect to the disciplinary process, CCCF in fact acted discriminatorily by failing to make accommodations. Snider argues that the actions for which CCCF officials

> disciplined him, such as failing to wear his name tag, hitting a door, and being disruptive, were manifestations of his mental illness. By issuing him misconducts for these manifestations and by punishing him in the same way other non-mentally ill inmates would have been punished, CCCF failed to accommodate his disability, and, thus, discriminated against him.

*Snider*, 2016 WL 4154927 at *8.

Here, the allegations in Plaintiff's Complaint warrant a similar conclusion. In essence, the facts alleged in Plaintiff's Complaint contend that the PSP officers who responded at Burakho's home were aware that Burakho had a disability and nonetheless responded with significant force and did not employ de-escalation tactics as a result of PSP's failure to train the officers on responding to a mental health crisis. (*See* Doc. 1 ¶¶ 12, 13, 14, 15, 16, 17, 62, 63, 64, 70.) Because Plaintiff's Complaint plausibly alleges that PSP failed to accommodate Burakho's mental health emergency and thus discriminated against Plaintiff on the basis of his disability, the Court declines to dismiss Plaintiff's Complaint on this basis.

## D. Reasonable Accommodation

Finally, Defendant argues that Plaintiff fails to plausibly allege any alternative reasonable accommodation that could have been offered to Burakho. (Doc. 11 at 10-11.) Specifically, Defendant argues that:

> because there was an exigent threat, Plaintiff does not have an acknowledged reasonable accommodation. In fact, he has not pled what kind of accommodation would have prevented Mr. Burakho's actions. Indeed, the Troopers tried peaceful measures before Mr. Burakho acted with brandishing his rifle. Thus, Plaintiff has also failed to state a claim on this basis.

(*Id.* at 11.)

For his part, Plaintiff argues that the "exigent circumstances" exception does not apply in the Third Circuit and that he plausibly alleges available reasonable accommodations. (Doc. 13 at 10.) The Court will address each of these alleged bases for dismissal in turn.

## 1. Exigent Circumstances

Defendant first contends that "because there was an exigent threat, Plaintiff does not have an acknowledged reasonable accommodation" and dismissal is therefore warranted. (Doc. 11 at 11.)

The Court acknowledges that some federal courts have recognized a *de facto* "exigent circumstances" exception that precludes a plaintiff from alleging a reasonable accommodation.[14] *See, e.g.*, *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000); *Thompson v. Williamson County*, 219 F.3d 555, 558 (6th Cir. 2000); *Waller v. City of Danville*, 515 F. Supp. 2d 659, 663-64 (W.D. Va. 2007). *aff 'd*, 556 F.3d 171 (4th Cir. 2009); *Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1306 (D. Kan. 2005). These cases nonetheless fail to account for the authority in the Third Circuit that supports the proposition that the "exigent circumstances" exception does not apply or that it is accounted for in the analysis of the

---

[14] Defendant relies heavily on *Haberle* to contend that the exigent circumstances exception does apply and bars Plaintiff from alleging a reasonable accommodation. (Doc. 11 at 10-11.) Defendant's reliance is misplaced. In *Haberle*, the Third Circuit noted that it had yet to determine "whether and under what circumstances it is reasonable to require police officers to make accommodations during an arrest when they face an exigent threat." *See Haberle, 885 F.3d at 180 n. 11.*

"reasonableness" of a proposed accommodation under the ADA. First, in *Bentler*, this Court

held that:

> [t]he court declines at this time to apply the Fifth Circuit's exigent circumstances
> exception to the reasonable accommodation requirement under the ADA. *See*
> *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000). "Several district courts within
> the Third Circuit ... have declined to follow *Hainze* unless clearly 'exigent
> circumstances' were present at the time of the arrest." *Young v. Sunbury Police*
> *Dep't*, 160 F.Supp.3d 802, 809 n.33 (M.D. Pa. 2016) (collecting cases).
> Defendants are free to raise this argument again in a future motion after further
> factual development is accomplished through discovery.

*Bentler v. Nederostek*, No. CV 3:22-1107, 2023 WL 3510822, at *10 n. 2 (M.D. Pa. May 17,

2023).

Similarly, in *Broadwater,* this Court again declined to adopt the exigent

circumstances exception:

> The Commonwealth and the PSP urge the court to adopt the Fifth Circuit's
> holding in *Hainze v. Richards,* 207 F.3d 795 (5th Cir.2000), which held that the
> ADA does not apply to police officers' actions during an arrest. The court's
> esteemed colleague, the Honorable Yvette Kane, Chief Judge, undertook a
> thorough refutation of the *Hainze* opinion in *Schorr v. Borough of Lemoyne,*
> 243 F.Supp.2d 232, 235–39 (M.D.Pa.2003), which the court adopts *in toto. See*
> *also Gorman v. Bartch,* 152 F.3d 907 (8th Cir.1998) (holding that the transport
> of an arrestee is covered under the ADA); *Heckensweiler v. McLaughlin,* 517
> F.Supp.2d 707, 718 (E.D.Pa.2007) ("[S]erving an involuntary mental-health
> commitment order in a safe manner is a service or activity covered by [the
> ADA]...."); *Arnold v. City of York,* 340 F.Supp.2d 550 (M.D.Pa.2004) (agreeing
> with *Schorr* that the ADA applies to arrests).

*Broadwater v. Fow*, 945 F. Supp. 2d 574, 591 n. 15 (M.D. Pa. 2013).[15]

---

[15] Although the Court acknowledges that the Third Circuit abrogated a significant portion of this
Court's *Schorr, 243 F.Supp.2d 232,* opinion in *Haberle*, it did so specifically with respect to this Court's
finding that "that ADA deprivations could occur before the day of the problematic incident between the

Other decisions in this Circuit have also declined to adopt a broad exigent circumstances exception as found in the Fifth Circuit's *Hainze v. Richards* decision. *See, e.g., Arnold v. City of York*, 340 F. Supp. 2d 550, 554 n. 2 (M.D. Pa. 2004); *Mohney v. Pennsylvania*, 809 F. Supp. 2d 384, 399 (W.D. Pa. 2011).

Although these decisions related to factual allegations that were generally less dangerous than the allegations here with respect to Burakho running away with a long rifle in his hands, the Court nonetheless concludes that it would be inappropriate at this stage to dismiss Plaintiff's Complaint on this basis. This decision is in light of Plaintiff's allegations that Barukho was shot in the back while running away from the PSP officers who were at the scene and who had previously deescalated similar encounters with Burakho. (Doc. 1 ¶¶ 12, 13, 14, 15, 16, 17, 18, 62, 63, 64, 65.)

It would be anomalous for the Court to conclude that, even in the face of these arguably exigent circumstances, there was no plausible reasonable accommodation other than shooting Barukho in the back while running away from PSP officers.[16] Therefore, the Court will decline to adopt at the pleading stage an "exigent circumstances" exception with

_____

citizen and the police." *Haberle*, 885 F.3d at 179. Importantly, the cases discussed in this Opinion relate to allegations of discrimination or a failure to accommodate, not simply a failure to train alone. So is the case here, where Plaintiff alleges that Defendant's failure to accommodate arose at the time that officers responded to the scene, rather than simply alleging that Defendant's failure to train was actionable by itself.

[16] Even if the Court adopted the exigent circumstances exception with respect to Plaintiff's ADA claim, Plaintiff has pled sufficient factual allegations in his Complaint to plausibly support his contention that reasonable accommodations were available to Defendant and that Defendant failed to accommodate Burakho. Therefore, Plaintiff's claim under the Rehabilitation Act also survives Defendant's attempt at dismissal on exigent circumstances grounds.

respect to Plaintiff's ADA claim in this instance, and, in the absence of a fully developed

record, will instead proceed to more thoroughly evaluate whether Plaintiff has plausibly

alleged reasonable accommodations that may have been available to Burakho.

### 2. Available Reasonable Accommodations

Defendant argues that dismissal is warranted because Plaintiff "has not pled what

kind of accommodation would have prevented Mr. Barukho's actions." (Doc. 11 at 11.) On

the contrary, Plaintiff has plausibly alleged accommodations that could have prevented

Barukho's actions and subsequent death. In his Complaint, Plaintiff alleges that the PSP

"fail[ed] to deploy the Special Emergency Response Team (SERT), the specialized unit in

the PSP that is comprised of officers and troopers that are specifically trained in tactical and

negotiation responses." (Doc. 1 ¶ 77.) Additionally, Plaintiff alleges that "[t]he SERT Team

was available to be deployed to Mr. Burakho's residence." (*Id*. ¶ 78.) In addition to this

specific accommodation pled by Plaintiff, Plaintiff also alleges that "[...] Troopers Brown and

Kressler (and the other responding officers) did not have any training with respect to

individuals with mental health conditions, regarding having peaceful encounters with

mentally disabled persons, deescalating situations involving mentally unstable individuals

and/or responding to calls that may require a 302 and/or involuntary commitment." (*Id*. ¶

70.) Finally, Plaintiff alleges that "[r]easonable accommodations for individuals with mental

disabilities and mental health conditions include, but are not limited to, employing the

passage of time to advantage, using non-threatening communication, respecting the

individual's comfort zone and not unreasonably agitating or exciting the individual and instead calming the situation."[17] (*Id.* ¶ 67.) Indeed, the Complaint alleges that on previous occasions the PSP officers who are Defendants here had deescalated similar encounters with Burakho. (*Id.* ¶¶ 12-26.)[18]

Plaintiff thus pleads plausible accommodations in his Complaint that recognize the circumstances surrounding Plaintiff's call concerning Barukho's behavior and his possession of a long rifle. The Court will therefore decline to dismiss Count II and III of Plaintiff's Complaint on this basis.

## V. CONCLUSION

Plaintiff alleges sufficient facts in his Complaint to make plausible claims under the ADA and Rehabilitation Act. Therefore, for the reasons set forth above, Defendant's Motion to Dismiss the Complaint (Doc. 6) will be denied. A separate Order will follow.

Robert D. Mariani
United States District Judge

---

[17] The Court disregards the conclusory statement characterizing various alternative acts by PSP officers as "reasonable accommodations" contained within this otherwise factual allegation. See *Ethypharm,* 707 F.3d at 231 n.14.

[18] Despite Defendant's arguments to the contrary (Doc. 14 at 10-11), it is of no moment that Defendant is alleged to have deployed some tactics in an attempt communicate with Burakho. It remains an open question as to whether those strategies, including attempting to call Burakho and speak to him via a bull horn, constituted a "reasonable accommodation" for the purpose of the ADA and Rehabilitation Act. Defendant is permitted to raise these arguments again on a summary judgment motion.